IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and CHARLES A. WHOBREY, as Trustee,<br><br>Plaintiffs,<br><br>v.<br><br>CRANDELL BROS. TRUCKING CO.,<br><br>Defendant. | No. 20-cv-05284<br><br>Judge John J. Tharp, Jr. |

## MEMORANDUM OPINION AND ORDER

A collective bargaining agreement between Crandell Brothers Trucking Company ("Crandell") and the International Brotherhood of Teamsters, Local Union No. 243 (the "Union") required Crandell to contribute to the Central States, Southeast and Southwest Areas Pension Fund (the "Fund"). Contractual agreements governing the relationship between the parties and the Fund prohibited Crandell from withdrawing its contribution obligation during the stated term of the collective bargaining agreement. The collective bargaining agreement, in turn, automatically renewed each year after a stated end date unless the parties followed specific termination procedures. Although the collective bargaining agreement described those procedures unambiguously, Crandell chose not to follow them. Instead, Crandell and the Union agreed to withdraw Crandell's contribution obligations—without the Fund's input—in a "new" iteration of the agreement.

This suit arose when the Fund discovered that the original collective bargaining agreement had not been terminated. The Fund and its trustee sued Crandell under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132, for the unpaid contributions, plus

interest and liquidated damages. Crandell moves to dismiss, arguing that under the new collective bargaining agreement—which, it posits, terminated the old one—it was free to abandon its contribution obligations. The Fund opposes the motion and moves for partial summary judgment on the issue of Crandell's contractual liability. Because the original collective bargaining agreement clearly set forth termination procedures that Crandell did not follow, the Court finds that Crandell prematurely withdrew its contribution obligations during the agreement's stated term. Accordingly, Crandell's motion to dismiss is denied, and the plaintiffs' partial motion for summary judgment is granted.

## BACKGROUND

The Court accepts the Fund's well-pleaded facts as true when considering Crandell's motion to dismiss, *Cent. States, Se. & Sw. Areas Pension Fund v. Vanguard Servs., Inc.,* 498 F. Supp. 3d 988, 994 (N.D. Ill. 2020), and considers the facts in the light most favorable to Crandell when considering the Fund's motion for summary judgment, *Hancock v. Illinois Cent. Sweeping LLC*, 73 F. Supp. 3d 932, 936 (N.D. Ill. 2014). In any event, this case involves the interpretation of contracts that contain unambiguous terms (as the Court will explain). Because the relevant facts are recited in documents that govern this case, they are largely undisputed. *See Cent. States, Se. & Sw. Areas Pension Fund v. Standard Elec. Co.*, 87 F. Supp. 3d 810, 812 (N.D. Ill. 2015).

Crandell is a trucking company that serves the construction industry in Michigan. In 2016, Crandell and the Union entered into a collective bargaining agreement, which became effective in July of that year (the "2016 CBA"). Among other terms governing the relationship between Crandell and the Union, the 2016 CBA obligated Crandell to contribute to the Fund for each of Crandell's covered employees.

The parties' dispute centers around Article XX of the 2016 CBA, which bears the heading "Termination of Agreement." 2016 CBA at 18, ECF No. 1-1. Section 1 of Article XX contains

what is known as an "evergreen clause"—that is, a clause that extends the parties' agreement until one of the parties provides notice of an intent to terminate it. *Operating Engineers Loc. 139 Health Benefit Fund v. Gustafson Const. Corp.*, 258 F.3d 645, 649 (7th Cir. 2001). Section I of Article XX provides:

> This Agreement shall be in full force and effect from July 1, 2016, to and including June 30, 2019 and shall continue in full force and effect from year to year thereafter unless written notice of desire to cancel or terminate the Agreement is served by either party upon the other at least sixty (60) days prior to date of expiration.

2016 CBA at 18, ECF No. 1-1. Section 2 of Article XX sets forth the method by which the parties may revise, rather than cancel, the agreement. That section provides:

> It is further provided that where no such cancellation or termination is served and the parties desire to continue said Agreement, either party may serve upon the other a notice, at least sixty (60) days prior to June 30, 2019 or June 30 of any subsequent contract year, advising that such party desires to continue this Agreement but also desires to revise or change the terms or conditions of such Agreement. The respective parties shall be permitted all lawful economic recourse to support their request for revisions if the parties fail to agree thereon.

*Id.*

In addition to the 2016 CBA, Crandell and the Union entered into a Participation Agreement, in which Crandell agreed to participate in the Fund in accordance with the CBA's terms and to be bound by the Fund's Trust Agreement. The Participation Agreement contained restrictions on terminating Crandell's contribution obligation. In relevant part, Paragraph 5 of the Participation Agreement states:

> This Agreement and the obligation to pay contributions to the [Pension Fund] will continue after the termination of a collective bargaining agreement . . . . This Agreement and the Employer's obligation to pay contributions shall not terminate until . . . b) the Employer is no longer obligated by a contract or statute to contribute to the [Pension Fund] and the [Pension Fund has] received a written notice directed to the [Pension Fund] . . . which describes the reason why the Employer is no longer obligated to contribute.

3

Participation Agreement ¶ 5, ECF No. 1-3. The next relevant paragraph of the Participation Agreement, Paragraph 6, specifies:

> When a new collective bargaining agreement is signed or the Employer and the Union agree to change the collective bargaining agreement, the Employer shall promptly submit the entire agreement or modification to the [Pension Fund] Contracts Department by certified mail (return receipt requested) at the address specified above. . . . The following agreements shall not be valid . . . (a) an agreement that purports to retroactively eliminate or reduce the Employer's statutory or contractual duty to contribute to the [Pension Fund] . . . or c) an agreement that purports to prospectively eliminate the duty to contribute to the Pension Fund during the stated term of a collective bargaining agreement that has been accepted by the Pension Fund.

In the Participation Agreement, Crandell further agreed to be bound by the Trust Agreement. The relevant part of that Agreement is Article III, Section 7, which states:

> An Employer is obliged to contribute to the Fund for the entire term of any collective bargaining agreement or participation agreement or any other written agreement accepted by the Fund (including any extension of a collective bargaining agreement through an evergreen clause or through an extension agreement of eighteen months or less) on the terms stated in that collective bargaining agreement, except as provided in [inapplicable provision]. The following provisions contained in any agreement shall not be enforceable against the Fund (regardless of when the agreement was entered into): a) a provision contained in either a collective bargaining agreement or participation agreement or any agreement entered into by an Employer and Union subsequent to the collective bargaining agreement that purports to authorize the elimination or reduction of the duty to contribute to the Fund before the termination of the collective bargaining agreement and/or participation agreement and/or other agreement under its duration provision (including any extension through an evergreen clause).

Trust Agreement at 12, ECF No. 1-4.

On April 1, 2019, the Union sent a letter to Crandell, indicating that it "desires to continue its existing agreement, but also desires to negotiate changes and revisions in such agreement," tracking the language of Article XX, Section 2 of the 2016 CBA. 4/1/2019 Letter from Union to Crandell, ECF No. 1-2. Neither that letter nor any other written communication between the parties during this period mentioned a desire to cancel or terminate the 2016 CBA.

4

About four months later, on July 26, 2019, Crandell sent the Fund a letter, stating that Crandell's contribution obligations ended on July 22, 2019. Crandell attached a copy of a "new" CBA between it and the Union ("2019 CBA"). That agreement, which stated that it became effective on July 22, 2019, purported to eliminate Crandell's obligation to contribute to the Fund and to replace the Fund with a 401(k) plan. The Fund received this letter sometime between July 30, 2019, and August 2, 2019.[1]

The Fund then requested that Crandell and the Union provide it with any written notice of termination that had been served pursuant to Article XX of the 2016 CBA. When Crandell sent the Fund the Union's April 1, 2019 letter in response, the Fund concluded that the April letter did not terminate the 2016 CBA and that the CBA continued in force through June 30, 2020. The Fund accordingly took the view that Crandell's contribution obligation therefore extended to June 30, 2020, as well. Crandell, however, did not contribute to the Fund or provide the work history of eligible employees (as Crandell was obligated to do pursuant to the 2016 CBA) after July 27, 2019.[2]

The Fund sued Crandell, seeking the unpaid contributions on behalf of employees working from July 28, 2019, to June 30, 2020, plus post-judgment interest.[3] Crandell moves to dismiss the

---

[1] In its complaint, the Fund alleges that it received the 2019 CBA on or around August 2, 2019, while in its Local Rule 56.1 statement, the Fund states that it received it on July 30, 2019. This difference, however, is immaterial for the purpose of this opinion. Crandell accepted this date when moving to dismiss the Fund's claims and chose not to contest the Fund's alternative claim. As detailed below, moreover, the date that the Fund received the 2019 CBA does not matter because Crandell was not permitted to terminate its contribution obligations during the term of the 2016 CBA.

[2] Although Crandell sent the Fund a check purporting to cover contributions and interest owed between July 28, 2019 to August 2, 2019, the Fund returned that check. The Fund perceived that the check was issued with a restrictive endorsement that sought to eliminate the Fund's entitlement to liquidated damages, additional contributions, and attorney fees.

[3] In the alternative, the Fund seeks the unpaid contributions that it alleges Crandell did not remit between July 28 to approximately August 2, 2019, when the fund received the 2019 CBA.

Fund's complaint for failure to state a claim pursuant to Rule 12(b)(6). The Fund opposes the motion and moves for partial summary judgment on the issue of liability.[4]

## DISCUSSION

Section 515 of ERISA requires that an employer contribute to a multiemployer pension plan under the terms of the plan or a collective bargaining agreement "to the extent not inconsistent with the law" and "in accordance with the terms and conditions of such plan or such agreement." 29 U.S.C. § 1145. As the Seventh Circuit has explained, Congress enacted this provision to protect the reliance interests of pension funds as third-party beneficiaries to contracts between unions and employers. *See Cent. States, Se. & Sw. Areas Pension Fund v. Gerber Truck Serv., Inc.*, 870 F.2d 1148, 1151-52 (7th Cir. 1989). These protections extend even beyond those afforded under federal common law; pension funds rely on the contract formed between a union and employer and must fulfill obligations to employees notwithstanding any problems with the formation of that contract. *Id.* Consistent with these principles, courts have construed strictly the terms of collective bargaining agreements as they pertain to pension funds. *See Chicago Reg'l Council of Carpenters Pension Fund v. Carlson Constructors Corp.*, No. 17-CV-04242, 2022 WL 874608, at *7-8 (N.D. Ill. Mar. 24, 2022). In fact, courts both within and outside of this district have held that a defense to contribution obligation based on the termination of a collective bargaining agreement "is only available if the termination is incontestable." *Id.* at *5 (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Sara Lee Bakery Grp., Inc.*, 2010 WL 6614902, at *5 (N.D. Ill. July 12, 2010),

---

In light of the Court's conclusion that Crandell's contribution obligation remained in force through June 30, 2020, there is no need to consider the Fund's alternative position.

[4] The parties do not dispute that the partial summary judgment question only addresses contractual liability. *See* Fed R. Civ. P. 56(a) (allowing a party to move for summary judgment on a "claim or defense" or "part of each claim or defense"). Both parties seem to agree that Crandell may be able to assert estoppel or other extracontractual defenses to liability at a later stage of litigation. The Court need not address those issues at this stage.

*report and recommendation adopted*, 2011 WL 862040 (N.D. Ill. Mar. 10, 2011)) (collecting cases). Here, Crandell raises such a termination defense, arguing that its collective bargaining agreement with the Union terminated in July 2019, and its obligation to contribute to the Fund along with it.

Crandell's termination defense is one that courts in this circuit have often considered and rejected. *See*, *e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Transervice Logistics, Inc.*, 56 F.4th 516, 528 (7th Cir. 2022); *Cent. States, Se. & Sw. Areas Pension Fund v. Kabbes Trucking Co.*, No. 02 C 1809, 2004 WL 2644515, at **18-19 (N.D. Ill. Nov. 18, 2004); *Sara Lee Bakery Grp.*, 2010 WL 6614902, at *5. Indeed, this case is a near carbon copy of *Central States, Southeast and Southwest Areas Pension Fund v. Standard Electric Company*, 87 F. Supp. 3d 810 (N.D. Ill. 2015). In that case, like this one, a union and employer modified a collective bargaining agreement imposing obligations to contribute to the Fund, and the Fund argued that the parties did not timely terminate the collective bargaining agreement. *Id.* at 811. Like *Standard Electric*, this case presents two questions. *Id.* at 813. The first is whether the 2016 CBA Agreement terminated, as Crandell argues, on July 22, 2019, the effective date of the 2019 CBA. If Crandell is right, then pursuant to the Trust Agreement, its obligation to contribute to the Fund ended on the day that the Fund received the new CBA, on August 2, 2019. If, on the other hand, the term of the 2016 CBA continued to June 30, 2020 pursuant to its evergreen clause, the Court must answer a second question. That question is whether Crandell and the Union could agree—without the Fund—to terminate Crandell's contribution obligations during the stated term of the 2016 CBA. *See id.* The answers to both questions are as clear here as they were in *Standard Electric*: the terms of the 2016 CBA extended beyond July 22, 2019, and the relevant plan documents prohibited the Union and Crandell from terminating the Fund's contribution obligations. *See id.*

I.     **Termination**

Starting with the termination question, Article XX, Section 1 of the 2016 CBA spells out that it "shall be in full force and effect from July 1, 2016, to and including June 30, 2019 and shall continue in full force and effect from year to year thereafter unless written notice of desire to cancel or terminate the Agreement is served by either party upon the other at least sixty (60) days prior to date of expiration." To terminate the CBA, either party therefore had to indicate such "desire to cancel or terminate" by May 1, 2019, or by that date each subsequent year. Neither party proceeded in that manner; in fact, the parties evinced the opposite desire. On April 1, 2019, the Union sent Crandell a letter indicating "a desire[] to *continue* its existing agreement" but "to negotiate changes and revisions in *such agreement*." (emphasis added). 4/1/2019 Letter from Union to Crandell, ECF No. 1-2. That letter expressed an intent to continue with the 2016 CBA, and neither the Union nor Crandell served the other party notice of a desire to terminate it before May 1, 2019. The 2016 CBA therefore remained in effect until at least one year later, on June 30, 2020.[5] Pursuant to the 2016 CBA's evergreen clause and without the requisite notice, that agreement could not have ended on July 22, 2019.

Section 1's unambiguous language notwithstanding, Crandell argues the Union's April 1, 2019 letter was a termination notice under Section 2 of the 2016 CBA. Under Section 2, either party may provide notice of a "desire to continue [the] agreement but also to desire to revise or change [its] terms or conditions" sixty days before the expiration of the agreement under a similar

---

[5] While it is clear that the 2016 CBA agreement remained in effect until at least June 30, 2020, the record does not establish when the agreement finally terminated; nothing in the record indicates that either the Union or Crandell ever served a notice of intent to terminate the 2016 CBA pursuant to Section 1. Nevertheless, the Fund seeks unpaid contributions only "from the 2016 CBA period of July 28, 2019 through June 30, 2020." Compl. ¶ 47(a)(i), ECF No. 1. The Court will therefore address only that time period in this opinion.

evergreen clause. That provision, however, applies "***[w]here no such cancellation or termination is served***" (emphasis added). Section 2 unequivocally provides for a mechanism to revise, rather than terminate the 2016 CBA. As the court in *Standard Electric* noted when interpreting nearly identical language, Section 2 "erects a clear distinction between seeking revision of and terminating" the 2016 CBA; by definition, such a desire to continue and amend cannot be a termination. 87 F.Supp.3d at 814; *see also Off. & Pro. Emps. Int'l Union, Loc. 95 v. Wood Cnty. Tel. Co.*, 408 F.3d 314, 315 (7th Cir. 2005) (explaining that "desire to reopen" discussions about and "termination" of a collective bargaining agreement are distinct concepts); *accord Transervice Logistics*, 56 F.4th at 528 ("a desire to renegotiate was not equivalent to a desire to terminate").

Crandell argues that Section 2 enabled the parties to keep the terms of an old collective bargaining agreement in place while the parties negotiated a new, controlling CBA. According to Crandell, "[i]f a party gives notice under Section 2 . . . the 2016 CBA terminates on the later of June 30, 2019 or the date that the parties agree to a new collective bargaining agreement." Def.'s Memo in Supp. of Mot. to Dismiss at 6, ECF No. 11. Although Section 2 may indeed allow parties to keep a governing agreement in place while the union negotiates new terms, that section does not say anything about the date of the 2016 CBA's termination. Only Section 1 addresses termination. Courts must "interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law." *M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). A bedrock principle of contract interpretation is that the words of the contract control when the terms are unambiguous. *See Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir. 1998). And when it comes to collective bargaining agreements, courts enforce those terms "strictly.*" Contempo Design, Inc. v. Chicago & N.E. Ill. Dist. Council of Carpenters*, 226 F.3d 535, 546 (7th Cir. 2000). No matter what Crandell says it intended, only

9

written notice of termination could end the term of the contract pursuant to Article XX, Section 1 of the 2016 CBA.

Attempting to reveal an ambiguity, Crandell points to the first sentence of the 2016 CBA, which states in part that the agreement "shall remain in full force and effect until June 30, 2019 and thereafter from year to year unless changed in accordance with Article XXI [sic][6] of this Agreement." 2016 CBA at 1, ECF No. 1-1. A modification under either section of Article XX of the 2016 CBA, Crandell argues, therefore renders the agreement no longer in full force in effect, *i.e.*, terminating it. Whatever the import of this introductory statement, it cannot create an ambiguity where the terms in the contract's body are clear. *See Jogi v. Voges,* 480 F.3d 822, 834 (7th Cir. 2007). As discussed, there is nothing ambiguous about Section 1 of Article XX: the sole method of terminating the contract.

In any case, the 2016 CBA's introductory sentence is entirely consistent with the Fund's reading. *See Morawski v. Loc. 703, I.B. of T., Grocery & Food Employees' Pension Plan*, No. 20 C 1889, 2021 WL 5049775, at *4 (N.D. Ill. Jan. 8, 2021) (interpreting plan language according to "principles that the contract should be read as a whole and each provision or clause is given full force and effect and so the terms make sense when read together"). Terminating the 2016 CBA is a change "in accordance with" Article XX. The only way to terminate the contract is laid out in Section 1, and the parties did not follow that method. Just as in *Standard Electric* (which involved a collective bargaining agreement with the same prefatory language upon which Crandell hangs

---

[6] The introductory sentence of the 2016 CBA refers to Article XXI, instead of Article XX. The Court agrees with Crandell that this is an obvious scrivener's error; the 2016 CBA contains no Article XXI, and the only Article in the 2016 CBA that refers to the term of the agreement is Article XX. Although the Fund refuses to concede that point, this factual dispute is immaterial. Even if the preamble meant to refer to Article XX, that language does not render Section 2 ambiguous.

10

its hat), once the deadline for noticing termination passed and the 2016's CBA's end date became June 30, 2020, Section 1 "locked in Crandell's contribution obligation through that date." 87 F. Supp. 3d at 814.

Crandell contends that *Standard Electric* is no longer persuasive authority in light of the Seventh Circuit's holding in *Michels v. Central States, Southeast, and Southwest Areas Pension Fund*, 800 F.3d 411 (7th Cir. 2015). In *Michels*, a union and an employer entered into a collective bargaining agreement that contained an obligation to contribute to the Fund. *Id.* at 413-14. That collective bargaining agreement contained a similar evergreen clause to the one in this case; it terminated on a specified date and continued year after year unless one of the parties gave timely notice of termination. *Id.* Unlike Crandell, however, Michels gave the Union timely notice that it wished to ***terminate*** the agreement before its stated expiration date. Michels never revoked that notice of termination "and so the CBA was terminated in keeping with this procedure." *Id*. at 419. After termination of the CBA, the parties entered into a series of interim letter agreements to extend some of the original agreement's terms, but "[e]ach one of these letter agreements stood on its own." *Id.* at 414, 419. One of those interim agreements eliminated prospectively the employer's obligation to contribute to the Fund. *Id.* at 414-15. The Seventh Circuit held that the employer and union were free to eliminate the employer's obligation to contribute to the Fund in subsequent interim agreements executed while negotiations on a new collective bargaining agreement continued. *Id.* at 417-20. Key to the Seventh Circuit's analysis was that the parties had terminated the agreement consistent with its requirements—something that did not happen here until after the 2016 CBA had automatically renewed through June 2020 by operation of the evergreen provision.

Crandell reads *Michels* as holding that any amendment to a collective bargaining agreement terminates that agreement. On Crandell's reading, parties to a collective bargaining

11

agreement may eliminate contribution obligations by modifying the terms at any time, no matter what that agreement or the accompanying pension fund documents say. That case does not reach so far. Instead, *Michels* stands for the unexceptional proposition that when the parties terminate a collective bargaining agreement, they mean it, notwithstanding any provisional extensions of certain terms or ongoing negotiations.

Crandell acknowledges that the employer in *Michels* gave proper notice of termination under the original collective bargaining agreement, *id.* at 414, but argues that the Union similarly noticed its intention to terminate here. But the Union did no such thing under the 2016 CBA's own terms; it asked Crandell only for a modification. *Michels* did not change the Seventh Circuit's practice of "routinely uphold[ing] the validity of automatic rollover clauses when the CBA includes clear termination clauses and the essential termination procedures have not been properly followed." *Vulcan Const. Materials, L.P. v. Int'l Union of Operating Engineers*, No. 09 C 1724, 2009 WL 5251889, at *7 (N.D. Ill. Nov. 25, 2009) (collecting cases).

To the contrary, the Seventh Circuit recently reiterated that termination agreements are to be enforced strictly. "When an evergreen clause provides that termination will occur upon timely notice of intention to terminate, as in this case, anything short of a clear expression of such intent fails to qualify as effective termination notice under the terms of the evergreen clause." *Transervice Logistics,* 56 F.4th at 525. In *Transervice*, a union advised employers in a series of notices that a collective bargaining agreement was due to expire, and that the union wished to "meet with [the employers] at an early date for the purpose of negotiating a new contract." *Id*. at 523. Under the district court's interpretation, the notices evinced an intent to terminate because they mentioned an expiration date but did not mention a desire to continue the contract. *Id.* at 527. The Seventh Circuit held that reasoning to be antithetical to the purpose of evergreen clauses,

12

which exist to "ensure an agreement will extend beyond its expiration date when parties take no action or take any action short of that required for termination." *Id*. Nor, the Court held, did the stated desire to negotiate a new contract suffice as notice of an intent to terminate the existing agreement; "[the court] do[es] not infer from a party's expressed desire to negotiate a new contract that it is ready to abandon the inplace agreement regardless of the outcome of the negotiations." *Id.* at 528.

*Transervice*, not *Michels*, controls this case and compels the conclusion that Crandell failed to provide the notice of termination required by the 2016 CBA. Crandell could have followed the "essential termination procedures" of the 2016 CBA and chose not to do so. *Vulcan Const. Materials*, 2009 WL 5251889, at *7. Pursuant to the 2016 CBA's terms, the Court must give effect to that choice.

**II.     Contribution Obligation**

Having concluded that the 2016 CBA remained in place when the Union and Crandell purported to eliminate Crandell's contribution obligation to the Fund, the Court must determine whether that was permissible. As noted in *Standard Electric*, a pension fund is a third-party beneficiary to a collective bargaining agreement between an employer and a union. 87 F. Supp. 3d at 815. Under federal common law, which governs the interpretation of contracts under ERISA, "contractual parties may not 'modify the contract without any [intended] beneficiary's consent' (1) where the 'contract expressly prohibits the parties from modifying their duties to intended beneficiaries' or (2) where the beneficiary 'justifiably relies on' the unmodified provision." *Id.* (quoting *Price v. Pierce*, 823 F.2d 1114, 1122 (7th Cir. 1987)). These principles are especially critical considering the Seventh Circuit's emphasis on protecting the expectations of pension funds as third-party beneficiaries. *See Gerber Truck Serv.*, 870 F.2d at 1153. Accordingly, when the plan documents forbid an employer's withdrawal from an obligation to make pension contributions

during a stated term, an employer may not withdraw early. *Cent. States, Se. & Sw. Areas Pension Fund v. Waste Mgmt. of Michigan, Inc.*, 674 F.3d 630, 632-33 (7th Cir. 2012).

Reading the plan documents together, the Court finds multiple express prohibitions on modifying the parties' duties to the Fund. Starting with the Participation Agreement—which bound Crandell and the Union to the Trust Agreement—the fifth paragraph states that Crandell's contribution obligation continues even after the termination of a collective bargaining agreement. But as Crandell points out, when "the Employer is no longer obligated by a contract or statute to contribute to the [Pension Fund]" and the Fund receives notice, the provision ending its obligation to contribute is triggered. Participation Agreement ¶ 5, ECF No. 1-3. Crandell argues that the 2019 CBA is the "contract" that relieved it of its contribution obligations. That might be a fair interpretation if it were not for section c) of paragraph six, which states that "an agreement that purports to prospectively eliminate the duty to contribute to the Pension Fund during the stated term of a collective bargaining agreement" shall not be valid. *Id.* ¶ 6. Putting together those two provisions, Crandell cannot rely on the "invalid" 2019 CBA as a contract that ends its contribution obligations because the 2019 CBA purports to do so during the "stated term" of the 2016 CBA. As the previous section explains, when the 2019 CBA became "effective," the stated term of the 2016 CBA continued until at least June 30, 2020.

Paragraph six, section c) of the Participation Agreement also forecloses Crandell's attempt to distinguish this case from *Standard Electric* based on the difference between retroactive and prospective changes. Although the court in *Standard Electric* held invalid a union and employer's attempt to retroactively eliminate a contribution obligation in a collective bargaining agreement, 87 F. Supp. 3d at 812, the Participation Agreement in this case forbids any prospective elimination

14

during the "stated term." The prescription against prospective changes in paragraph six of the Participation Agreement here renders the distinction one without a difference.

Recognizing that paragraph six of the Participation Agreement poses a problem, Crandell seeks to obfuscate the meaning of the phrase "stated term." These efforts are unavailing. It does not matter that the Participation Agreement does not define "stated term," or that the Trust Agreement uses a slightly different phrase, "entire term." No reasonable person could read Article XX, Section 1 of the 2016 CBA—which describes when the agreement is "in full force and effect"—and fail to understand that it describes either the "stated" or "entire" term of the contract. *See Young v. N. Drury Lane Prods., Inc.*, 80 F.3d 203, 205 (7th Cir. 1996). The "stated term" of the 2016 CBA, as set forth in Section 1 of Article XX, was through June 30, 2019, if termination notice was provided by May 1, 2019, or June 30 of any subsequent year in which termination notice was provided by May 1. That Section 2 also appears under the "termination of agreement" heading does not render the "stated term" ambiguous either; Section 2 specifically provides that it applies "where no such cancellation or termination is served." The predicate for Section 2's relevance, in other words, is that ***notice of termination has not been provided***; that predicate is of no help to Crandell's argument that the April 2019 letter constituted notice of termination. And while Crandell may wish to present extrinsic evidence to support its position about the Fund's supposed intentions, the Court cannot use such evidence to resolve a nonexistent contractual ambiguity. *Transervice Logistics*, 56 F.4th at 531 (reiterating "the fundamental principle that if a contract is unambiguous, [courts] will not consider extrinsic evidence in its interpretation, especially with respect to the rights of a third-party beneficiary that is entitled under ERISA to enforce the contracts as written").

15

The Trust Agreement lends even more support to the Fund's position. As the court in *Standard Electric* noted when interpreting nearly identical language, Article III, Section 7(a) "expressly prohibit[ed] the parties from modifying their duties to" the Fund through its requirement that Crandell contribute to the Fund for the "entire term" of the 2006 CBA. 87 F. Supp. 3d at 815. "Entire term," like "stated term," means "the [2016] CBA's entire term, not some portion of the term." *Id.* at 814. Interpreting Article XX, Section 2 to mean that a collective bargaining agreement is terminated whenever the employer and union decide the obligation is over would render the "entire term" provision "toothless." *Id.* at 816.

Further, Article III, Section 1 of the Trust Agreement allows an employer's contribution to end when the Fund receives a "collective bargaining agreement signed by both the Employer and the Union that eliminates the duty to contribute to the Fund" but only "***after*** termination of the [original] collective bargaining agreement." Trust Agreement at 9-10, ECF No. 1-4 (emphasis added). Thus, even if, as Crandell argues, the 2019 CBA satisfied one of those provisions by eliminating the duty to contribute, it did not satisfy the other because it was entered into during the 2016 CBA's term.

In fact, the Trust Agreement envisions precisely this scenario in Article III, Section 7(a), where it states that "a provision contained in . . . a [subsequent] collective bargaining agreement . . . that purports to authorize the elimination or reduction of the duty to contribute to the Fund before the termination of the collective bargaining agreement" is invalid, "regardless of when the agreement was entered into." *Id.* at 12. The Trust Agreement confirms, therefore, that if the 2019 CBA was entered into before the 2016 CBA terminated, any contribution elimination provision in the 2019 CBA is unenforceable. Again, termination is key and distinguishes this case from *Michels*. In that case, the employer gave the union unequivocal notice of termination pursuant to

the original collective bargaining agreement, and thus a new, interim agreement triggered the elimination of the contribution obligation pursuant to the similarly worded Trust-Agreement provision. 800 F.3d at 412. Here, there was no termination, and therefore any withdrawal terms in the "new" CBA were invalid.

At bottom, the Trust and Participation Agreements imparted upon the Fund the expectation that it would not be impacted for the "entire term" of the 2016 CBA. The Fund was entitled to rely on those writings. The default under the 2016 CBA was the continuation of Crandell's contribution obligation to the Fund; unless the Union or Crandell gave a termination notice, the 2016 CBA would continue in perpetuity. Against that default expectation of continuous replenishment, the Fund "rel[ied] on documents to determine the income [it] c[ould] expect to receive, which govern[ed] th[e] determination of levels of benefits." *Geber Truck Serv.*, 870 F.2d at 1151. True, the Union and Crandell could decide to terminate the CBA at any time before the sixty-day expiration period, and the plan documents did not require either party to give notice of termination to the Fund. But the parties bargained for the security that the Union and Crandell would not eradicate the Fund's obligations during a specified period. Interpreting that specified period to mean anything other than the 2016 CBA's definition would open the door to sloppy contract writing, at best, and opportunities for manipulation, at worst. *See id.* at 1154. "By allowing multiemployer funds to enforce the literal terms of an employer's commitment, section 515 increases the reliability of their income streams, reduces the cost and delay associated with collection actions, and reduces or eliminates the cost of monitoring the formation of collective bargaining agreements." *Bakery & Confectionery Union & Indus. Int'l Pension Fund v. Ralph's Grocery Co.*, 118 F.3d 1018, 1021- 22 (4th Cir. 1997). In holding Crandell to its commitment, the Court reinforces the principles animating section 515 of ERISA.

As in *Standard Electric,* the 2016 CBA, Trust Agreement, and Participation Agreement, read in tandem, "expressly prohibited" the Union and Crandell from modifying Crandell's contribution obligation during the stated term of the contract. 817 F. Supp at 817. Under principles of contract interpretation protecting the rights of third-party beneficiaries, that is enough to prevent the modification of the 2016 CBA's contribution obligations. The Court therefore need not consider extrinsic evidence regarding the Fund's justified reliance—or lack thereof—on the unmodified 2016 CBA. *Id.*

\*   \*   \*

For the foregoing reasons, the Court finds invalid the terms of the 2019 CBA purporting to eliminate Crandell's employment contributions to the Fund. Crandell's motion to dismiss is therefore denied, and the Fund's partial motion for summary judgment is granted.

Dated: February 8, 2023

John J. Tharp, Jr.
United States District Judge